UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

GINA HOPPER,

                Plaintiff,

           v.                                      Case No. 04-CV-1099

LEGACY PROPERTY MANAGEMENT
SERVICES, LLC,

                Defendant.

_____

## ORDER

On November 12, 2004, plaintiff Gina Hopper (Hopper) filed a complaint alleging that defendant Legacy Property Management Services, LLC, (Legacy) subjected Hopper to sexual discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Hopper also claims that Legacy retaliated against her after she filed a complaint with the president of Legacy on December 22, 2003, detailing the alleged sexual discrimination and sexual harassment. Hopper claims that the complaint set off a chain of events that led to her constructive discharge approximately six weeks later on February 10, 2004. Legacy has filed a motion for summary judgment. For the reasons stated below, the court will grant Legacy's motion.

## BACKGROUND[1]

Legacy provides property management services for residential apartment complexes in Southeast Wisconsin, including Candlewick in Greenfield and

_____

[1] The court will cite to the plaintiff's proposed findings of fact as "PPFOF" and the defendant's proposed findings of fact as "DPFOF."

Stationside Village (Stationside) in Kenosha. Hopper was the property manager for Stationside prior to 1998, when Legacy purchased the complex. Thereafter, Hopper became a Legacy employee and she continued to function as the property manager for Stationside. At that time, Hopper was supervised by Legacy's president, David Nankin. Nankin promoted Hopper to the position of regional property manager in 1999 or 2000, and by 2003, Hopper was responsible for managing Legacy's Stationside and Candlewick apartment complexes. After Legacy began managing Candlewick, Hopper relocated her primary office from Stationside to Candlewick, however she maintained a desk at Stationside in an office she shared with the Stationside property manager, Aurora Vargas.

Nankin directly supervised Hopper for over five years and the two communicated frequently during this time. They occasionally disagreed over work issues, and they hung up on one another during telephone conversations on more than one occasion. (Nankin Dep., 24-25, 31). The occasional involvement of Armin Nankin, David Nankin's father and the owner of Candlewick, created confusion for Hopper with regard to her role in the organization. (Hopper Dep., 42, 44-46). As a result, Nankin and Hopper's relationship deteriorated after Legacy took over Candlewick and throughout 2003. (Hopper Dep., 41-46; Nankin Dep., 21, 23-29). In August 2003, at a lunch with Nankin, Hopper indicated that she was confused about her role in the organization and asked Nankin if he wanted her to quit, to which Nankin replied no. (Hopper Dep., 44-46; Nankin Dep., 25-26).

-2-

In 2003, Nankin believed that he was spending too much time dealing with the day-to-day issues associated with managing Legacy's four properties. In order to spend more of his time focusing on acquiring new properties and growing the business, Nankin hired Garth Doering as Legacy's vice president of operations. (Nankin Dep., 19-20, 31-33).

Doering began working at Legacy on October 1, 2003. Doering's responsibilities included oversight of the day-to-day operations at each of Legacy's four properties, oversight of the renovation project at Candlewick, and the development and implementation of marketing plans. (Doering Aff, ¶ 2). Doering was the direct supervisor for Hopper and Laurie Ludwig, another regional property manager. (Nankin Dep., 19). From the start, Doering and Hopper had a number of disagreements about how to go about accomplishing business objectives and other operational matters.

Besides Hopper, other Legacy employees clashed with Doering as well. Several Legacy employees viewed Doering as arrogant or a "know it all," and felt that Doering did not effectively communicate his priorities or directives, often changed his mind, micro-managed, could be overly-demanding on the staff and rude, would become defensive if his directives or authority were questioned, and spoke to employees in a manner that was condescending and demeaning. (Nankin Dep., 40, 42; Vadnais Dep., 32-33, 38-39; Morrison Aff., ¶¶ 4-6; Hopper Dep., 63-64, 66-67, 81, 83, 85, 129-30, 137, 148; Ludwig Aff., ¶ 3; Vargas Dep., 16, 21).

In November 2003, Hopper complained to Nankin about Doering's management style and expressed concern that Doering was taking away her responsibilities and making things difficult for all of Legacy's employees. (Hopper Dep., 69-70). By mid-November, several other Legacy employees had voiced similar concerns to Nankin about Doering's management and communication style. (Nankin Dep., 40, 42). In response to these complaints, Nankin convened a meeting to "clear the air" on December 4, 2003. (Nankin Dep., 42-43).

The meeting was attended by Nankin, Doering, Hopper, and other Legacy employees. At this meeting, the employees voiced their complaints about Doering's management and communication style. (Nankin Dep., 44-45; Hopper Dep., 86). While Hopper complained at this meeting about Doering's interaction with her on work issues, she did not complain about or mention at this time any instances of sexual discrimination or harassment. (Hopper Dep., 85-86, 106). After hearing the complaints, Nankin explained what his plans were for Legacy, where Doering and the other employees fit into those plans, and attempted to identify why and how Doering's interactions with others had been misinterpreted. (Nankin Dep., 44-45). At the conclusion of the meeting, Nankin believed that the employees' concerns had been adequately addressed. (Nankin Dep., 45).

Legacy's complaint process, provided in its employee handbook, states that "the employee should report the incident [of alleged harassment] promptly to his or her supervisor or to the President. A complaint against a supervisor or someone in a higher position at [Legacy] should be reported directly to the President."

(Hopper Dep., 31-34, 90, 122; Burk Aff., Ex. B-2, 2). On December 22, 2003, Hopper and her husband, John Hopper, met with Nankin in his office and presented him with a 15-page complaint detailing her concerns about Doering's conduct and describing the alleged sexual discrimination and harassment. (Hopper Dep., 96-97, 177, Ex. B-6).

In her complaint, Hopper presented, among other concerns, the following 11 instances of inappropriate conduct by Doering: (1) in October 2003, Doering told her that he was "her nemesis," that Nankin had hired him because he no longer wants to have any personal relationships with any of his employees, and that Nankin no longer respected her opinion because she was a woman; (2) in November 2003, Doering told Hopper's coworker, Aurora Vargas, to tell Hopper that he "still loved her"; (3) in November 2003, Doering told her that she was being uncooperative during a discussion regarding a work issue and that if she did not like the way he was doing things that she could leave her employment at Legacy; (4) Doering blew a kiss to Hopper through a window in November 2003; (5) Doering pushed her and told her to "quit being such a woman" in November 2003; (6) In response to a request for his opinion regarding the color of paint on a wall in November 2003, Doering stated "All I can see is Gina's big butt, and I'm going to kick it"; (7) in December 2003, Doering chastised Hopper for a situation involving a former tenant's complaint; (8) in December 2003, Doering said "fuck you" to another employee in her presence; (9) in December 2003, Doering "verbally assaulted" Hopper in the course of a disagreement they had over the use of

contractors to paint apartments because Doering was "simply in the mood to badger someone"; (10) in December 2003, after she had given out Doering's cell phone number to an irate tenant, Doering yelled at Hopper and threw a stack of papers at her; and (11) Doering's interaction with Heidi Kafkas, a part-time leasing agent, had "ma[d]e most all people in the vicinity uncomfortable," and had created "a pervasive feel" in the workplace. (Hopper Dep., 96; Heins Decl., Ex. B-6; DPFOF, ¶ 62).

When Hopper presented her complaint to Nankin, Nankin told her that he was taking her complaint "personally." (Hopper Dep., 174). The parties disagree as to whether Nankin's response meant that he was personally upset by her filing of the complaint, (PPFOF, ¶ 59; Hopper Dep., 174), that Nankin meant that he would be personally involved in resolving her concerns and he would personally investigate her allegations, or that he meant that he was upset because of the change in the environment at Legacy. (Nankin Dep., 61-62.). After Hopper presented the complaint to Nankin, he told her that she could take the rest of the day off. (Nankin Dep., 61).

Hopper alleges that Legacy retaliated against her after she lodged the complaint by, among other things, transferring her to a different office location, allowing her to be yelled at by a coworker, and assigning her large amounts of less desirable work until February of 2004, when she claims she was constructively discharged. The following facts describe much of the alleged retaliation.

To minimize Hopper's contact with Doering while Nankin investigated her allegations, Nankin told Hopper that she should temporarily work from Stationside until he completed his investigation approximately one month later, on January 20, 2004. (Hopper Dep., 170-73; Heins Decl., Ex. B-7). While Hopper was temporarily relocated to Stationside she did not lose any pay or benefits, and she was supervised by Nankin, not by Doering. (Hopper Dep.,172-73; Nankin Dep., 65). Hopper had but one contact with Doering during the time she was working from Stationside, at which time Hopper told Doering that they should not be talking and Doering thereafter made no further attempts to contact her. (Hopper Dep., 189).

During the time Hopper was working from Stationside, Nankin relieved her of the day-to-day operational issues associated with managing Candlewick. (Nankin Aff., ¶ 10). The operational tasks required to run Candlewick were handled by Doering and Laila Vadnais, another Legacy employee, while Hopper was working from Stationside. (Vadnais Dep., 134-37; Nankin Dep., 67). Hopper, however, continued to perform work associated with Candlewick, particularly the 2004 budget. (Nankin Aff., ¶ 10).

Occasionally when Nankin called Stationside, if Vargas answered the phone, Nankin would ask her to pass messages on to Hopper. (Hopper Dep., 187). The parties disagree as to whether Nankin had Vargas pass messages to Hopper because there was only one phone line going into the office at Stationside and Vargas had answered the telephone, or whether it was because Nankin was avoiding Hopper. (PPFOF, ¶ 65; Hopper Dep. 187; Vargas Dep., 28).

Hopper claims that Nankin retaliated against her by, among other things, refusing to sign a report for a state housing agency, telling her that she was unprofessional, chastising her for reassigning a Candlewick employee to work from Stationside without informing him, and for providing the company's unedited financial data to an external auditor. (Hopper Dep., 175-80, 188, 190-91; Nankin Dep., 134-35).

Hopper felt that she was assigned duties beneath her position after she filed the complaint. (PPFOF, ¶ 62). While working from Stationside, Hopper prepared reports, including painting and carpet cost justification reports, a marketing analysis, a "Monday Morning Report," placement reserves, and the 2004 budget for Stationside and Candlewick, which Nankin had assigned to her in October or November of 2003. (Hopper Dep., 58, 174-82, 184-87; Heins Decl., Exs. B-8, B-10, B-11). The work that Nankin assigned Hopper, including these reports and the budget, was work that the other Legacy property managers were also required to perform. (Hopper Dep., 40-41, 178-80, 186-87; Nankin Dep., 50; Vadnais Dep., 160-61; Ludwig Aff., ¶¶ 6,7).

During Nankin's investigation into Hopper's allegations of sexual discrimination and harassment, Nankin spoke with each individual Hopper identified in her complaint as witnessing an alleged incident. (Nankin Dep., 68-71). While Hopper felt that Nankin, as the owner of Legacy, should not have conducted the investigation himself, and claimed that Nankin pressured witnesses to avoid supporting the allegations in her complaint, Legacy contends that Nankin did not

seek witnesses to be less than truthful. (PPFOF, ¶¶ 72-75; DPFOF, ¶¶ 98-99). Other Legacy employees testified that Nankin asked them to tell him the truth and that he had neither promised any benefit nor made any threats regarding the information he was requesting. (Vadnais Dep., 94-95; Vargas Dep., 32.)

Nankin concluded his investigation in mid-January of 2004 and prepared a report detailing his findings and conclusions. (Nankin Aff., ¶ 11, Ex. A). Among Nankin's conclusions were that: (1) Doering had engaged in some of the inappropriate conduct that Hopper had alleged; (2) Hopper's allegations regarding a relationship between Doering and Kafkas were unfounded; and (3) the employees all "recognize a difference in managerial and conversational style between Mr. Doering and [Nankin]." (Nankin Aff., ¶ 11, Ex. A).

On January 20, 2004, Nankin met separately with Doering and Hopper to discuss with them the results of his investigation. (Nankin Dep., 71-73, 75, 84). Nankin met with Doering and issued him a written warning which stated that Doering's behavior on occasion had been inappropriate and such behavior must cease or disciplinary action would follow. (Nankin Dep., 75, 84). In particular, Nankin's written warning to Doering stated that: (1) while "most of [Hopper's] concerns are with your supervisory style and the level of scrutiny you are giving her performance," he was troubled by her allegations of inappropriate conduct; and (2) the things Doering had allegedly done were unprofessional and did "not have a place in our work environment," and that "repeat occurrences of this nature will not be tolerated under any circumstance." (Nankin Aff., ¶ 12, Ex. B). Nankin also

warned Doering of disciplinary consequences, warned him against retaliating against Hopper, and encouraged him "to make every reasonable effort to work with her courteously, professionally, and calmly." (Nankin Aff., ¶ 12, Ex. B). Doering indicated that he understood the warning, would comply with it, and signed it, after which Nankin placed the warning in Doering's personnel file. (Nankin Dep., 84).

Nankin also met with Hopper and informed her that he had concluded his investigation and that she should resume working from Candlewick. (Hopper Dep., 198-99). Nankin went over a letter with Hopper which stated that: (1) he had developed a strategy to resolve the concerns she raised about Garth Doering's supervisory style and his conduct; (2) he felt she would "experience a difference in [her] working relationship with Mr. Doering and that [she would] be satisfied with the changes"; and (3) she should bring further concerns promptly to his attention. The letter stated that Hopper should keep in mind that Doering was her supervisor and that she should "willingly execute the tasks he assigns, provide input where appropriate, and to conduct yourself professionally in dealing with others." (Hopper Dep., 202-03; Heins Decl., Ex. B-13). Regarding Hopper's concerns about the alleged relationship between Doering and Kafkas, the letter also directed Hopper to "refrain from starting or repeating any unsubstantiated rumors about your fellow employees or the Company." (Hopper Dep., 203-04; Heins Decl., Ex. B-13; Nankin Dep., 72-73).

Hopper was upset by Nankin's letter and she refused to sign it because she felt it was "too bogus." (Hopper Dep., 203-04). Hopper took the remainder of the

week off; she felt that she needed the time to get her courage up before going back to work at Candlewick where she would again be supervised by Doering. (PPFOF, ¶ 80; Hopper Dep., 204-05; Nankin Dep., 87).

On January 21, 2004, the day after Nankin provided Hopper with the letter summarizing his investigation into her complaints, Hopper filed a charge of discrimination with the EEOC, alleging sexual harassment and retaliation. (Compl., ¶ 19; Hopper Dep., 245-46; Heins Decl., Ex. B-19). The EEOC charge encompassed the events that Hopper identified in her December 22, 2003 complaint to Nankin, and also included allegations of retaliation occurring through January 20, 2004. (Hopper Dep., 246-50; Heins Decl., Ex. B-19).

Hopper returned to work at Candlewick on January 26, 2004. (Hopper Dep., 249). During the course of a conversation on that day, Hopper told Nankin "You don't want me here and I don't want to be here" and asked Nankin "What's it going to take?". (Hopper Dep., 222-23; Nankin Dep., 117-18). Legacy asserts that Hopper was implying that she wanted Nankin to terminate her employment. (DPFOF, ¶ 127). Hopper also told Nankin that he was "a sorry excuse for a human being" and "the meanest person in the world." (Hopper Dep., 221; Nankin Dep., 117-18).

On January 29, 2004, Legacy hosted a seminar which all of Legacy's employees were expected to attend. (Hopper Dep., 207-08; Heins Decl., Ex. B-14). Invitations for the seminar and meal selections were arranged during the week that Hopper was not working, after Nankin had told her to resume her duties at

Candlewick.  (Hopper Dep., 208-09).  A dinner was arranged for those individuals who helped plan and coordinate the seminar.  (Nankin Aff., ¶ 14).

Although Hopper was invited to the seminar and was sent a request to identify her meal selection, as a result of a conversation in which Doering told her that he wanted to keep Candlewick's office open during the seminar, Hopper did not attend either the seminar or the dinner.  (Hopper Dep., 208-09, 216-18, 286; Nankin Aff. ¶ 14).  While Hopper believed that Doering was telling her that she could not go to the seminar and asked him if that was what he was saying, she admits that Doering told her that she was welcome to attend, but that he wanted to somehow keep the office open. (Hopper Dep., 208-10; Heins Decl., Ex. B-14).  Doering had similar conversations with the other property managers regarding keeping their offices open during the seminar.  (Doering Aff., ¶ 6).

On January 28, 2004, Hopper e-mailed Nankin to complain about the events surrounding the seminar, the dinner, and to communicate her displeasure upon returning to Candlewick.  (Hopper Dep., 208; Heins Decl., Ex. B-14).  In the e-mail, Hopper recounted her exchange with Doering regarding keeping the office open during the seminar, and noted that she felt she was being "black balled, relieved of duties, made the butt of incorrect gossip and speculation within [the] company, and made to feel most unwelcome in all things."  *Id.*

Nankin responded to Hopper's e-mail on January 29, 2004.  (Hopper Dep., 216-18; Burk Aff., Ex. B-3, 5-6).  In Nankin's response, he attempted to dispel Hopper's perception that she was being treated poorly and explained how things

had transpired with the seminar. *Id.* Nankin also directed Hopper to meet with the other Legacy employees with the most knowledge regarding events that had transpired during her absence from Candlewick so she could promptly resume her property management duties at Candlewick. *Id.*

On February 2, 2004, Doering sent Hopper a memo outlining her responsibilities and priorities. (Hopper Dep., 226-27; Burk Aff. Ex. B-3, 9). In this memo, Doering addressed issues of an operational nature, including: (1) Hopper's attendance; (2) a problem that had occurred with having keys ready for a new resident; (3) Hopper's management of the staff; and (4) the requirement that each staff member prepare a job description to help clarify each employee's responsibilities within the company. *Id.* Doering claims that the letter did not differ in tone from previous communications he had with Hopper, but that it was in writing because Doering wanted to document how he was communicating with Hopper and what he was saying in light of the warning he had received. (Doering Aff, ¶ 8).

Hopper responded to Doering's memo with a letter in which she: (1) highlighted her confusion about roles and responsibilities within the organization and about the direction the company was heading; (2) attempted to justify the shortfalls that had occurred; and (3) laid blame on Doering for the state of confusion she perceived. (Hopper Dep., 228; Heins Decl., Ex. B-16). Hopper further questioned the validity of the concerns Doering had raised in his memo and raised many concerns regarding how he handled her return to Candlewick. *Id.*

-13-

On February 4, 2004, Nankin responded to Hopper's letter to Doering. (Hopper Dep., 229-30; Heins Decl., Ex. B-17). Nankin pointed out that he did not believe Hopper's comments were offered constructively, "but instead, were sarcastic, and were offered in an effort to create conflict, dictate the manner in which this business is managed, or to simply air [her] opinions." *Id.* Nankin reiterated to Hopper that Doering was her supervisor, and that she was obliged "to carry out his lawful directives." *Id.* Nankin's letter further denied Hopper's allegations of retaliation and reiterated his willingness to work with Hopper in resolving the work issues that were distracting him, Doering, and Hopper. *Id.*

On February 9, 2004, Doering wrote Hopper another memo detailing specific concerns, including issues with snow removal, payroll, readiness for new tenant move-ins, interactions with subordinates, and office staffing. (Burk Aff., Ex. B-3, 16). Although Doering indicated an unhappiness with some of Hopper's work and her "unwillingness to accept policy or procedure changes," he indicated his continued willingness to work with her in turning things around. *Id.*

On or about February 10, 2004, Hopper called Nankin to tell him that she was resigning her employment because she could no longer tolerate what she considered to be verbal and mental abuse from Doering and Nankin. (Compl., ¶ 20; PPFOF, ¶ 108). Hopper followed up her resignation with a letter to Nankin, in which she proclaimed that she considered herself to have been constructively discharged. (Heins Decl., Ex. B-18). The EEOC issued Hopper a right to sue letter on August 13, 2004, and Hopper filed this action on November 12, 2004.

## ANALYSIS

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255 (1986).

In her response to Legacy's motion for summary judgment, Hopper concedes that the evidence adduced in discovery no longer supports her claim for Title VII sexual discrimination, and that the defendant's motion for summary judgment should be granted on that claim. Hopper also concedes that Legacy can establish a successful affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742 (U.S. 1998) that defeats her Title VII sexual harassment claim, and that the defendant's motion for summary

judgment should be granted on that claim. Hopper asserts that the defendant's motion for summary judgment on her Title VII retaliation claim should be denied. (Pl.'s Resp. Br., 2.) Thus, Hopper's Title VII retaliatory constructive discharge claim is the only remaining claim.

As a preliminary matter, Legacy asserts that Hopper is barred from asserting her constructive discharge claim because by failing to bring the constructive discharge claim before the EEOC, she failed to exhaust her administrative remedies.

While Hopper never amended her EEOC charge to include allegations of constructive discharge, or to include any of the events that transpired after January 20, 2004, Hopper claims that her constructive discharge and related events were communicated to EEOC in a letter dated March 6, 2004. (DPFOF, ¶ 170; Heins Decl., Ex. A). The letter from plaintiff's counsel informed the EEOC mediator that Hopper claims that the defendant retaliated against her for filing the EEOC charge, that Hopper claims she was constructively discharged, and detailed Hopper's damages estimates. (Heins Decl., Ex. A).

Hopper also asserts that she did not fail to exhaust her administrative remedies because the alleged retaliatory conduct arose from conduct already being investigated by the EEOC, and as a result, no amendment of her EEOC complaint was required in order to include her retaliatory constructive discharge claim.

Hopper's failure to file a new EEOC complaint or to amend her complaint to include new allegations of retaliation and constructive discharge is not fatal to her

judicial complaint. The judicial complaint in a Title VII case can embrace not only the allegations in the EEOC complaint, but also discrimination like or reasonably related to the allegations of the complaint and growing out of such allegations, specifically including retaliation for the filing of the complaint. *Jenkins v. Blue Cross Mut. Hospital Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (quoting *Danner v. Phillips Petroleum Co.*, 447 F.2d 159, 162 (5th Cir. 1971). The policy reason for this flexibility is that "having once been retaliated against for filing an administrative charge, the plaintiff will naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989).

Hopper alleges that after she filed her EEOC complaint she was, among other things, effectively demoted, inundated with petty criticism, insulted by Nankin and Doering, and asked to do more work. These claims of retaliation relate to Nankin's and Doering's prior actions that Hopper alleged in her EEOC complaint. For example, Hopper stated in her EEOC complaint that Nankin and Doering retaliated against her for filing her internal complaint with Nankin in December of 2003, by, among other things, transferring her to Stationside, assigning her more work, and taking a negative attitude toward her. (Heins Decl., Ex. B-19, 3). The court concludes that Hopper's allegations of retaliation and constructive discharge are reasonably related and grow out of the discrimination and harassment allegations in her EEOC complaint. Thus, Hopper's complaint sets forth a cognizable claim of retaliatory constructive discharge.

Title VII prohibits, among other things, an employer from discriminating "against any of [its] employees . . . because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff has two routes to establish a Title VII retaliation claim. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). One is to present direct evidence that the plaintiff engaged in protected activity and as a result suffered the adverse employment action of which the plaintiff complains. *Id.* (holding that direct evidence is evidence that establishes an adverse employment action without resorting to inferences from circumstantial evidence). In the second route, an adaptation of the burden shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must demonstrate that after the plaintiff engaged in a statutorily protected activity, the plaintiff was treated less favorably than other similarly situated employees who did not engage in the protected activity, even though the plaintiff was performing his or her job in a satisfactory manner. *See Stone*, 281 F.3d at 643-44; *see also Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).

Hopper's filing of the EEOC complaint constitutes a protected expression, and the court will assume that Hopper's filing of the complaint to Nankin also constitutes a protected expression. Thus, in order to establish a Title VII retaliation claim, Hopper must demonstrate that after she filed the complaint, she suffered an adverse employment action, or that she was treated less favorably than other

similarly situated Legacy employees, even though she was performing her job in a satisfactory manner. Hopper asserts that she presents direct evidence of an "adverse employment action" and Legacy's retaliation when she points to Nankin's statement in his deposition that the reason he reprimanded Hopper, and not Aurora Vargas, for spreading the rumor about the alleged relationship between Doering and Kafkas, was because Vargas was not "under investigations and had not filed any complaints" with Nankin. (Nankin Dep., 73).

The reprimand, which was part of Nankin's January 20, 2004 letter summarizing the results of his investigation into Hopper's complaint, consisted of a request that Hopper refrain from spreading unfounded rumors. Specifically, the letter stated:

> Lastly, please be advised that I consider it inappropriate and inconsistent with the standards of conduct for you to raise any false and potentially harmful implications about your fellow employees, such as you did with regard to Mr. Doering's alleged relationship with Heidi Kafkas. You must refrain from starting or repeating any unsubstantiated rumors about your fellow employees or about this Company.

(Heins Decl., Ex. B-13).

The Seventh Circuit has held that a letter of reprimand is not an adverse employment action unless the letter is accompanied by some other action such as job loss or demotion. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1992). Here, even if the court construes Nankin's letter as a reprimand, it is clear that Hopper did not suffer job loss or a

-19-

demotion. To the contrary, the record demonstrates that Nankin and Doering were willing to work with Hopper to resolve her concerns and to help make clear her responsibilities at Legacy. (Burk Aff., Ex. B-3, 1, 5-6, 9, 14-17). As such, Nankin's letter does not rise to the level of an adverse employment action or constitute retaliation under Title VII.

Taking all the evidence in a light most favorable to the plaintiff, as the court must, the court concludes that a reasonable finder of fact could not find that Hopper has shown that she suffered an adverse employment action that gives rise to a claim of constructive discharge. Constructive discharge is an example of a materially adverse employment action. *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). To state a claim for constructive discharge, a plaintiff must show that his or her working conditions were so intolerable that a reasonable person would have been compelled to resign. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). To demonstrate a constructive discharge, a plaintiff must demonstrate a discriminatory work environment "even more egregious than the high standard for hostile work environment." *Univ. of Chicago Hosps.*, 276 F.3d at 331-32; *see also Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (stating that unpleasant conditions such as arbitrary reprimands, exclusion from office activities, lack of supervisor support, denial of a flex-time request, and harassing phone calls did not give rise to a claim of constructive discharge). An employee may not be unreasonably sensitive to his or her working environment, and the employee must seek redress while remaining

in his or her job unless confronted with an aggravating situation beyond ordinary discrimination. *Rabinovitz*, 89 F.3d at 489.

In cases finding constructive discharge, the plaintiffs suffered from much more severe and sustained harassment than the type of harassment Hopper alleges. *See, e.g., Snider v. Consolidation Coal Co.*, 973 F.2d 555, 558 (7th Cir. 1992); *Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992). In *Taylor*, the Seventh Circuit found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol, and held it to one plaintiff's head. *Taylor*, 966 F.2d at 1191. In *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir. 1989), the plaintiff established constructive discharge where "repeated instances of grossly offensive conduct and commentary" culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her. *Id.* at 423-24. The harassment alleged by Hopper falls well short of the type of harassment that courts have found to be sufficient to support a finding of constructive discharge.

In her brief opposing the defendant's motion for summary judgment, Hopper points to 20 incidents which she claims demonstrate adverse employment actions and support a finding of retaliatory constructive discharge. While the incidents demonstrate that it was unpleasant adjusting to Doering's condescending management style and that Hopper was subjected to criticism, not every workplace

-21-

slight is actionable. The Seventh Circuit has noted that "mere unhappiness and inconvenience are not actionable under Title VII." *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)*; see also Krause*, 246 F.3d at 1001 ("[A] materially adverse change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (citation omitted). The court addresses the specific instances of alleged retaliation below.

Hopper asserts that Nankin's statement to her and her husband when they submitted the complaint to him on December 22, 2003, that he was taking her complaint "personally," demonstrates an adverse employment action. Hopper claims that the statement meant that Nankin was personally offended by her filing of the complaint. (PPFOF, ¶ 59; Hopper Dep., 174). Legacy contends that Nankin meant that he personally was going to be involved in resolving Hopper's concerns. (Nankin Dep., 61-62). Under either interpretation, the record does not support a conclusion that Nankin's statement constitutes an adverse employment action or retaliation. Hopper points to no evidence to suggest that Nankin meant that he was offended by her filing of the complaint, or that he made the statement to retaliate against her. Hopper's reliance on her subjective interpretation of Nankin's statement is insufficient to create a genuine issue of a material fact. As the Seventh Circuit noted, "if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be

doomed." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) (quoting *Visser v. Packer Eng'g Assocs*, 924 F.2d 655, 659 (7th Cir. 1991).

Hopper also asserts that after she filed her complaint she was effectively demoted because she was assigned duties beneath her position as a regional property manager. The record, however, demonstrates that Hopper was not demoted and that she was assigned the same amount and type of work which was assigned to all regional property managers. (Hopper Dep., 40-41, 178-80, 186-87; Nankin Dep., 50; Vadnais Dep., 160-61; Ludwig Aff., ¶¶ 6,7). Additionally, the assignment to create a 2004 budget for Stationside and Candlewick could not constitute retaliation because it was assigned to Hopper before she filed her complaint. (Hopper Dep., 58).

Hopper sets forth contradictory evidence regarding her workload. In her brief in opposition to summary judgment, Hopper asserts that she was assigned tasks beneath her position and that her workload increased after she filed the complaint. (Pl.'s Br. in Opp. to Summ. J., ¶¶ 4, 8; PPFOF, ¶ 67). However, in her deposition, Hopper claimed to have very little work to do at the time she claims she was constructively discharged. (Hopper Dep., 244).

Hopper asserts that her temporary assignment to work from Stationside was an adverse employment action. However, the record demonstrates that Nankin had a legitimate, non-retaliatory purpose for asking Hopper to work from Stationside, specifically, to minimize her contact with Doering. (Nankin Dep.,

64-65). Furthermore, it should be noted that throughout her tenure at Legacy, Hopper was responsible for supervising Stationside, she maintained a desk there, and Stationside was where her initial workplace had been. Moreover, Hopper's compensation and benefits remained the same when she worked from Stationside, and at the time she was asked to work from Stationside, she did not complain to anyone about the temporary relocation. (Hopper Dep., 171-73; Nankin Dep., 65).

Hopper also asserts that Nankin and Doering were overly critical of her work after she filed her complaint, however, the record demonstrates that the tone of the memos from Nankin to Hopper after she filed her complaint was consistent with those sent before she filed her complaint. (Burk Aff., Ex. B-2, 10-12). Hopper also states that she was buried in a "paper blizzard" of e-mails and written notes. (Pl's. Resp. Br., 12). Yet, an objective analysis of the notes reveals that they do not appear to be based on a retaliatory motive, but rather, the notes demonstrate that Nankin and Doering were attempting to resolve Hopper's concerns and clarify her responsibilities. (Burk Aff., Ex. B-3).

Hopper states that her Crohn's disease flared up because of the increased stress at work. Hopper asserts that, despite the fact that Nankin knew that stress has a debilitating effect on Crohn's disease, he and Doering continued to add stress to Hopper's work life. (Pl.'s Resp. Br., 13). Hopper claims that this makes Legacy liable under *Parrett v. Connersville*, 737 F.2d 690, 695 (7th Cir. 1984) (holding defendants liable for the costs of plaintiff's illness because they wanted and took measures to make the plaintiff's position intolerable and he became ill as

a consequence). However, unlike Hopper, the plaintiff in *Parrett* was subjected to intolerable working conditions by being forced to sit in a windowless room, with no telephone, and nothing to do. *Id.* at 693. Hopper does not demonstrate that her working conditions were intolerable. Unlike the plaintiff in *Parrett*, Hopper was given the same amount and type of work done by other Legacy employees at her level. (Hopper Dep., 40-41, 178-80, 186-87; Nankin Dep., 50; Vadnais Dep., 160-61; Ludwig Aff., ¶¶ 6,7).

Finally, Hopper asserts that several other actions demonstrate retaliation or adverse employment actions on the part of Legacy. For example, Hopper asserts that it was improper for Nankin, as president of the company, to perform the investigation into her complaint himself; that Nankin's written reprimand of Doering was inadequate; that it was an insult for her to be returned to Doering's supervision; that she was excluded from a seminar; that she was kept "out of the loop"; that Doering should not have disciplined or terminated another Legacy employee without her input; that she was unfairly forced to discipline another Legacy employee; that Nankin blamed her for the unpleasant work environment; and that Nankin sullied her reputation by contacting her past employers after she filed her EEOC complaint.

The court concludes that, taken together, these actions did not create working conditions so intolerable that a reasonable person would have been compelled to resign. For the record, there is no evidence that any of the alleged retaliatory acts were gender motivated. Nor has Hopper demonstrated that after

she filed the complaint, she was treated less favorably than other similarly situated Legacy employees, even though she was performing her job in a satisfactory manner. Rather, Nankin's and Doering's actions were consistent with actions which took place before Hopper filed her complaint and were common to other Legacy employees.

In light of the foregoing, the court is obliged to conclude that a reasonable finder of fact could not find that Hopper was subjected to adverse employment actions or constructively discharged. However unpleasant Hopper's work environment may have been, the actions Hopper complains of including the written notes, the request to not spread rumors, the temporary transferring of offices, and the communication problems are not the kind of adverse actions that the retaliation statute reaches. Taking all the facts in the light most favorable to Hopper, and drawing all reasonable inferences in her favor, there is no genuine issue of material fact requiring trial, and Legacy is entitled to summary judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment (Docket #11) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** with prejudice.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this  16th  day of May, 2006.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge